13 Kan. App. 2d 232 (1989)
767 P.2d 846
In the Interest of A.F.
No. 62,251
Court of Appeals of Kansas.
Opinion filed January 13, 1989.
Thomas M. Kowalski, of Shawnee Mission, for appellants.
Jeffrey A. Dehon, of Kansas City, for appellee.
Gerard McGhee, of Kansas City, guardian ad litem.
Before BRISCOE, P.J., LARSON and GERNON, JJ.
LARSON, J.:
In this "child in need of care" action, the paternal *233 grandparents (C.F. and S.F.) appeal from the district court's order that the maternal grandmother (E.B.) and the maternal grandfather (J.W.) remain the legal guardians of the minor child (A.F.).
A.F. was born to R.F. and R.F. on July 17, 1986. The natural mother is a paraplegic due to spina bifida, with attendant physical and emotional problems. The natural father has been in and out of Topeka State Hospital since his adolescence.
Complications resulted in A.F. remaining hospitalized for four weeks after her birth but, after being released from the hospital, she lived with E.B.J.W. and E.B. are divorced although they enjoy a good relationship and live next door to each other.
In September of 1986, E.B. caused a child in need care petition to be filed, requesting A.F. be temporarily placed with her. The first hearing was held in October 1986, at which time the natural mother stipulated A.F. was a child in need of care. The court ordered that, pursuant to K.S.A. 1987 Supp. 38-1584(b), the paternal grandparents, C.F. and S.F., be notified of the dispositional hearing set for December 3, 1986. At that hearing, C.F. and S.F. were made interested parties and, since they were desirous of custody of A.F., a study of their home was ordered. A home study of E.B.'s residence was admitted which recommended placement with her. The disposition report recommended E.B. be granted custody of A.F.
The motion for change of custody filed by the paternal grandparents in January of 1987 was not considered at the time of the review hearing in April. Legal and physical custody of A.F. was ordered to remain with E.B. and the natural parents and paternal grandparents were granted reasonable visitation. The paternal grandparents exercised a one-week visitation in May and June of 1987, and on June 30 filed another motion for change of custody.
A further review hearing was held on July 8, 1987, when the natural parents were present and advised the court they would not comply with the court's orders. The trial court ordered that physical and legal custody of A.F. remain with E.B., granted the natural mother reasonable visitation, prohibited visitation by the natural father, and approved alternating thirty-day visitations with the paternal grandparents, who live in a city in Kansas several hours' drive from E.B.'s residence.
The natural parents were adjudged unfit and their parental *234 rights were terminated in January of 1988. A post-termination disposition hearing was held on February 29, 1988, which considered the paternal grandparents' motion for change of custody. Both paternal grandparents, the maternal grandmother, the Wyandotte County Court Services Officer, and the S.R.S. officer who prepared the home study of the paternal grandparents' family testified. J.W. was present, but did not request nor was he granted interested party status.
The trial court's memorandum decision of March 16, 1988, designated E.B. and J.W. as guardians of the child, maintained the thirty-day visitation of A.F. with the paternal grandparents, and ordered the arrangement should continue until A.F. reaches school age, when visitation could be reviewed. From this order, the paternal grandparents appeal.
Under K.S.A. 1987 Supp. 38-1584(c)(2), after parental rights have been terminated and it does not appear that adoption is a viable alternative, the court shall:
"[E]nter an order granting custody of the child for foster care to a reputable person of good moral character, a youth residential facility, the secretary or a corporation or association willing to receive the child, embracing in its objectives the purpose of caring for or obtaining homes for children.
"(3) Preferences in custody for adoption or long-term foster care. In making an order under subsection (c)(1) or (2), the court shall give preference, to the extent that the court finds it is in the best interests of the child, first to granting such custody to a relative of the child and second to granting such custody to a person with whom the child has close emotional ties."
It is of primary importance to consider the overriding purpose of the procedure to be followed after termination of parental rights. K.S.A. 1987 Supp. 38-1584(a) provides:
"Purpose of section. The purpose of this section is to provide stability in the life of a child who must be removed from the home of a parent, to acknowledge that time perception of a child differs from that of an adult and to make the ongoing physical, mental an emotional needs of the child the decisive consideration in proceedings under this section. The primary goal for all children whose parents' parental rights have been terminated is placement in a permanent family setting." (Emphasis added.)
Our scope of review is well settled and, in the absence of evidence of abuse of discretion, the judgment of the trial court will not be disturbed on appeal. Decker v. Decker, 171 Kan. 380, 381, 233 P.2d 527 (1951). "[D]iscretion is abused only where no reasonable [person] would take the view adopted by the trial court." Powell v. Powell, 231 Kan. 456, 459, 648 P.2d 218 (1982).
*235 The trial court stated in its memorandum decision the following:
"The petitioner, maternal grandmother ... and her former husband have also met the required burden for post-termination disposition purposes that she and he can provide sufficient permanency, love, support and safety for said child within their means.
"The child has visited and lived with ... on alternative months, the paternal grandparents who also are capable of providing for the child. Both sides love the child very much and the evidence appears to indicate she enjoys being with all of them. It does not appear to me that it would be in the best interest of the child to interfere with this arrangement at this time.
"The paternal grandparents have not shown, or even attempted to show, that the petitioner, who has had custody to the child since birth, is not a fit party to have such custody."
C.F. and S.F. erroneously contend the trial court placed upon them the undue burden of showing the maternal grandparents were unfit. Between two competing custodial parties with equal interests, the question of unfitness is not the standard; rather, the standard is the best interests of the child. Paronto v. Armstrong, 161 Kan. 720, Syl. ¶ 4, 171 P.2d 299 (1946). Although it has been proposed that a better standard would be "the least detrimental available alternative for safeguarding the child's growth and development" the continuing applicable test in Kansas and that applied by the trial court herein is to view the facts in light of what is in the best interests of the child. C.F. and S.F. misconstrue the trial court's order as requiring a showing of unfitness for a change of custody to be justified.
C.F.'s and S.F.'s second contention, that the trial court's decision impacts so negatively on the child's development as to constitute an abuse of discretion, requires us to reverse and remand this matter for the trial court's further consideration. The trial court's finding that it is in the best interests of the child to be placed in alternating residences on a monthly schedule flies directly in the face of the clear edict of K.S.A. 1987 Supp. 38-1584, which states "the primary goal for all children whose parents' parental rights have been terminated is placement in a permanent family setting." (Emphasis added.) The legislative direction of permanency requires us to provide stability in the life of the child, to acknowledge that the time perception of a child differs from that of an adult, and to make the ongoing physical, mental, and emotional needs of the child the decisive consideration in proceeding under this section.
*236 The Kansas Code for Care of Children was the result of a thorough study by the Judicial Council, which clearly articulated the intended purpose of Section 1584 in stating:
"Subsection (a) charges the court with the requirement for what is often referred to as `permanency planning' so that a child whose parents' parental rights have been terminated does not float aimlessly in a variety of foster care placements." Kansas Code for Care of Children, Kan. Jud. Council Bull., June 1981, Comment at 50.
The Kansas Supreme Court Task Force on Permanency Planning set forth in its December 1986 publication the Kansas philosophy on permanency planning by stating:
"(1) Every child has a right to a permanent home.
"(2) All children belong in families, and whenever possible, their own families.
"(3) Foster care is a temporary arrangement, not a solution.
"(4) Permanency planning, while recognizing legal rights and responsibilities, must also recognize the significance of psychological and development time frame for the child in securing a permanent home."
In 1980, the United States Congress adopted the Adoption Assistance and Child Welfare Act of 1980, Pub. L. No. 96-272, 94 Stat. 500 (1980), which became the first federal legislation which focused on the issue of permanence. The Kansas Code for Care of Children was amended in 1983 to include the concept of permanence for children and to give courts the authority to monitor children in the foster care system to ensure that the mandates of Pub. L. No. 96-272 were met.
Each child develops a response to environmental influences to which that child is exposed. Unlike adults, children change from one state of development to another. Children experience events solely with reference to their own person and thus the mere move from house or location may be perceived as a grievous loss imposed upon them. Goldstein, Freud, and Solnit, Beyond the Best Interests of the Child, pp. 11-12 (1973). Selma Fraiberg, in Every Child's Birthright: In Defense of Mothering (1977), in discussing the bonding between a child and his or her "parent," states that any alternating of this bond may damage the psychological development of the child and permanently impair the child's capacity to love and form enduring human partnerships in later life.
In Lewis v. Lewis, 217 Kan. 366, 371-72, 537 P.2d 204 (1975), the Kansas Supreme Court discussed alternating residences in relation to the best interests of a child:

*237 "Although a court charged with the duty of awarding custody of a minor child clearly has the power to alternate or divide the periods of custody between the parents, it is generally agreed that divided custody should be avoided whenever reasonably possible. (See, generally, 92 A.L.R.2d 696.) We recognize the frequent shifting from one home environment to another could easily be detrimental to the emotional and physical well-being of any child."
The court in Lewis went on to approve the custody order where the mother had custody during the children's summer vacation from school with weekend visitation by the father and the father had custody of the children during the school year with weekend visitation by the mother.
In Travis v. Travis, 163 Kan. 54, 180 P.2d 310 (1947), custody of a four-year-old son was alternated between the parents every six months until the child commenced school. Once school commenced the mother had custody during the school year and the father had custody during the summer vacations. This was held not to be an abuse of discretion, but in so ordering the court in Travis stated:
"Of course, it may be said easily that shunting a child back and forth every few days or alternating its custody frequently is, as a matter of law, against the best interests of the child and an abuse of discretion." 163 Kan. at 61.
Among the cases considered by our Supreme Court in Travis was Towles v. Towles, 176 Ky. 225, 195 S.W. 437 (1917), where custody of two young boys was awarded to the mother for one month and to the father for the next month and so on. The Supreme Court of Kentucky reversed this ruling, saying that such an arrangement would be to the detriment of the children because it would give them no fixed or permanent home, but would keep them unsettled and on the move.
A somewhat similar situation cited by the Travis court was Larson v. Larson, 176 Minn. 490, 223 N.W. 789 (1929), where the wife was awarded custody of a child four years old; the wife then remarried and moved to another state. The husband obtained an order giving him custody during two named months and alternate weekends during the remainder of the year. On appeal, this order was reversed, the court stating that part-time or divided custody was not desirable and if the order were carried out the child would spend a substantial part of his life traveling, that moving between two homes and two states affected the home influence of the child; and that the order was an abuse of discretion in the situation.
*238 A recent example where alternating monthly custody was deemed an abuse of discretion is In re Marriage of Hickey, 386 N.W.2d 141 (Iowa App. 1986). The trial court's order that joint, legal, and physical custody of three- and six-year-old children be alternated each month was error and modified to award physical custody to the mother where the best interests of the children required the stability of one primary home. The mother had been and remained the primary caretaker of the children.
In the instant case, the order alternating placement between the grandparents on a monthly basis is considerably more frequent than the schedules of either Travis or Lewis. The order appealed from herein could only be justified if required by the totality of the circumstances.
A.F. is presided over by three separate caretakers while in the custody of E.B.: E.B. herself, J.W., and A.F.'s aunt. E.B. is forty-five years old, gainfully employed, and the mother of three adult children. She owns her own two-bedroom fully furnished home, and lives next door to J.W., who watches A.F. during the day. E.B.'s daughter has three children, ages 3, 5, and 7, and the court found A.F. cherishes the time she spends with her cousins. E.B. testified that she and A.F. do almost everything together, including playing with toys, cooking, reading books, and playing with the two family dogs. E.B. testified she and J.W. could provide a more than adequate home for A.F., but she had no objection in allowing A.F. to continue to see the paternal grandparents. A.F. has resided with E.B. since she was released from the hospital and, at the time of this appeal, is approaching two-and-one-half years of age.
The court services officer who conducted the home study on E.B.'s residence found her home appropriate for placement and advised the court that A.F. would be well taken care of in the placement of E.B.
The home study of the residence of the paternal grandparents showed the paternal grandmother is a homemaker available for continued day-long care of the minor child. This home was described as a "nurturing atmosphere" and its relationship with A.F. as an "affectionate situation." The paternal grandfather is employed by a communications company with a substantially larger income than E.B. enjoys. The paternal grandparents are *239 both in their forties. The guardian ad litem recommended A.F. be placed in their residence.
While the court's order might result in minimal satisfaction to the respective grandparents, it is not in the best interests of A.F. and violates our statutory goal of permanency planning for A.F. It is regrettable that there is no solution acceptable to all parties. Although someone may suffer, it should never be the child, who is totally innocent and without control over the environment into which the child is placed. The court's order allowing monthly visitation is in effect an order for alternating monthly custody between the grandparents, which is not in the best interests of the child and is an abuse of discretion.
This court will not weigh evidence or reach a decision as to which set of grandparents should be granted custody of A.F. The custody determination and grant of visitation is reversed and this action is remanded to the trial court for further hearing and an appropriate order of custody with limited visitation consistent with the statutory requirements and mandates of this opinion.
The order of the trial court must also be reversed as it relates to the designation of J.W. as a legal guardian, since he was never made an interested party or requested status as the guardian of A.F.
K.S.A. 1987 Supp. 38-1502(e) defines interested parties as follows:
"`Interested party' means the state, the petitioner, the child, any parent and any person found to be an interested party pursuant to K.S.A. 38-1541 and amendments thereto."
K.S.A. 38-1541 provides:
"Determination of interested party. Upon motion of any person with whom the child has been residing or who is within the fourth degree of relationship to the child and who desires to have standing to participate in the proceedings regarding the child, the court may order that the person may participate in the proceedings."
There is nothing in the record to indicate a motion was ever filed by J.W. to be granted interested party status. Nor is there anything in the record to indicate a finding by the court that J.W. is an interested party. The most that can be said about J.W.'s participation is that he was present in court at the time of the hearings. J.W. did not testify at the time of the post-termination dispositional hearing on February 29, 1988, nor was there any *240 home study of his residence. It was an abuse of discretion to award guardianship to J.W.
Reversed and remanded for further consideration in accordance with the mandates of this opinion.