34 Kan.App. 2d 317 (2005)
In the Interest of C.B., Date of Birth: 01/16/2003, A Child under the Age of 18 Years.
No. 93,468.
Court of Appeals of Kansas.
Opinion filed August 19, 2005.
Christian Webb, of Garretson & Webb, LLC, of Olathe, for appellant natural mother.
Steven J. Obermeier and Donald W. Hymer, Jr., assistant district attorneys, for appellee.
Lewanna Bell-Lloyd, of Olathe, for appellee interested party.
Michael W. Laster, of Laster, Miller & Brazeale, P.A., of Lenexa, for appellee guardian ad litem.
Before McANANY, P.J., GREEN, J., and LARSON, S.J.
GREEN, J.:
C.M. appeals the trial court's order terminating her parental rights in C.B. (date of birth 01/16/03). As a preliminary matter, it is necessary to address the issue of whether the State must file a verified brief in this termination of parental rights case. The State argues that the verification requirement of K.S.A. 38-1591(e) only applies to appellants. We agree. Because the State was not an appellant in this appeal, the State was not required to file a verification of its brief under K.S.A. 38-1591(e).
In her appeal, C.M. argues that the trial court erred in finding that there was clear and convincing evidence to determine that she was an unfit parent and that her unfitness was unlikely to change in the foreseeable future. We determine that there was substantial competent evidence to support the trial court's findings. Accordingly, we affirm.
C. B. was removed from the home of her parents, C. M. and D. B., on April 22, 2003. At that time, C. B. was approximately 3½ months old. Based on events that happened on that date, C.M. was later convicted of possession of methamphetamine, and D.B. was convicted *318 of unlawfully manufacturing a controlled substance. C.M. admitted that she had been using methamphetamine the week before C.B. was taken from her home.
The State filed a child in need of care petition based upon C.M.'s and D.B.'s failure to raise C.B. in a safe and sanitary home. C.B. was taken into the temporary custody of the Kansas Department of Social and Rehabilitation Services (SRS) and placed in the home of her paternal grandfather and step-grandmother. C.B. was found to be a child in need of care upon C.M.'s stipulation.
In May 2003, C.M. signed an achievement plan where she agreed to abstain from using drugs and to submit to random urinalysis drug tests (UA's). Nevertheless, C.M. admitted that she used drugs in August or September 2003. C.M. then signed a reintegration plan in October 2003 which required her to accomplish several tasks including obtaining counseling, having a home with suitable conditions, maintaining a permanent job or having enough income to fulfill a monthly budget, having a reliable source of transportation and a car seat, and submitting to urinalysis testing for drugs. C.M. was given until January 27, 2004, to complete the reintegration plan.
C.M. admitted that she failed to complete the reintegration plan in the 3-month period. During this period, C.M. tested positive for methamphetamine and also failed to show up for most of her UA's. Moreover, C.M. was still using methamphetamine at the end of the reintegration plan period.
Regarding the other tasks outlined in the reintegration plan, C.M. completed parenting skills classes. C.M. obtained a car and also leased a two-bedroom apartment. In May 2004, C.M. broke her lease and moved from the apartment. Moreover, D.B., whom C.M. admitted was still using drugs, resided with C.M. until January 26, 2004. Although C.M. was working at Ryan's Restaurant at the start of the reintegration plan 3-month period, she left her job in November 2003 and was not employed by January 2004.
According to C.M., she obtained individual counseling at Johnson County Mental Health but could not attend counseling sessions after February 2004 because she owed money there. When asked about whether she had provided monthly budgets as required by *319 the reintegration plan, C.M. indicated that she may have submitted budgets during part of the 3-month period. Nevertheless, C.M. indicated that she had not furnished budgets from January through May 2004. C.M. testified that she never missed any allowed visits with C.B. Evidence showed that C.M. had not been allowed to have her scheduled visit with C.B. in December 2003 due to C.M.'s use of methamphetamine.
In March 2004, a case planning meeting was held. At that time, the goal in the case was shifted from reintegration to adoption. After the meeting, Stacey Brison, who worked for SRS and was assigned to the case, explained to C.M. that she had failed the reintegration plan. Brison went through C.M.'s progress on all of the individual tasks and told C.M. that even though the plan had expired, she still needed to follow through with the tasks required by the plan. C.M. signed a permanency plan in which she agreed to comply with all the terms and conditions of the reintegration plan including abstaining from drug use.
Later that month, the State moved to terminate C.M.'s and D.B.'s parental rights. The next day, Carrie Massey, a case manager with The Farm, Inc., met with C.M. to go over the reintegration plan. At that time, C.M. was planning to move to Mississippi, and Massey discussed this move with C.M. Massey encouraged C.M. to continue with the tasks outlined in the reintegration plan and told C.M. that she would probably have to mail in her information. Several days after the meeting, C.M. again used methamphetamine.
On March 24, 2004, C.M. moved to Mississippi where she stayed with her aunt. C.M. was voluntarily admitted into inpatient treatment at the Mississippi State Hospital's chemical dependency unit where she attended lectures on working a 12-step program and relapse prevention; completed her GED; attended a parenting class and life skills class; attended either AA or NA meetings nightly; and progressed to the highest level in the program. C.M. successfully completed the program in 31 days. Upon her release from the program, C.M. agreed to an aftercare plan that included attending AA, NA, and Al-Anon meetings. It was recommended that she attend 90 meetings in 90 days.
*320 In May 2004, C.M. was arrested for violating her probation in Kansas. According to C.M., she had violated her probation by moving to Mississippi. She was placed in the Johnson County Residential Center where she was required to complete the orientation program, cognitive skills program, women's empowerment program, and lifeskills program, and had to attend relapse prevention classes. In addition, C.M. was required to submit a total of six UA's which all came back negative. When C.M. was released from the residential center in August 2004, she returned to living in Mississippi with her aunt.
The trial court conducted the termination of parental rights hearing in September 2004. At that time, C.B. was 20 months old and had been out of C.M.'s care for over 17 months. Both Massey's and Brison's opinions at trial were that C.M.'s parental rights should be terminated. Massey indicated that C.M. had failed the reintegration plan. According to Massey, she had not received monthly budgets, proof of employment, proof of residence, evidence of UA's since June 2004 when C.M. was in the residential center, or proof that C.M. had completed any programs or plans. Moreover, Massey indicated that before C.B. could be returned to C.M.'s home, an Interstate Compact Placement for Children (ICPC) would have to be started. An Interstate Compact Placement for Children would require C.M. have a permanent residence and usually takes about 6 months to complete.
C.M.'s testimony at the hearing revealed that she was currently living with her aunt but might be able to obtain her own residence in Mississippi within the next 3 to 4 months. C.M. also indicated that she could stay with her grandmother where C.B. could have her own room. At the time of the hearing, C.M. had been working full-time for approximately a week-and-a-half at a waterproofing company. C.M. indicated that she still had a car but was unsure if she had car insurance. When asked about child support, C.M. admitted that she was behind in her payments.
According to C.M., over the last 9 months, she had four 1-hour visits with C.B. For one of those visits, C.M. drove 26 to 28 hours roundtrip from Mississippi to see C.B. Regarding her drug use, C.M. testified that the last time she used drugs was in March 2004. *321 C.M. presented evidence that she submitted a negative UA on May 10, 2004. Nevertheless, C.M. had not been tested for drugs since she was released from the residential center and returned to Mississippi.
C.M. indicated that she had been unable to complete the recommendation from Mississippi State Hospital for 90 AA or NA meetings in 90 days. C.M. presented evidence that she had been attending alcohol and chemical treatment classes at her church for 1 hour each week. C.M. testified that she was also attending after-care group therapy relating to relapse prevention through the Mississippi State Hospital 1 night a week. According to C.M., she had not obtained mental health counseling because she could not afford to do so. Nevertheless, C.M. indicated that she planned to attend counseling when she was able to do so. At trial, C.M. presented documents showing that she had successfully completed classes and programs at Mississippi State Hospital and the Johnson County Residential Center. C.M. admitted that she had still not fully completed the reintegration plan.
At the conclusion of the hearing, the trial court terminated C.M.'s parental rights in C.B., determining that C.M. was unfit and that her condition was unlikely to change in the foreseeable future. Specifically, the trial court found that the State had proven by clear and convincing evidence the factors under K.S.A. 38-1583(b)(3), (4), (7), and (8), (c)(2), (3), and (4). D.B. relinquished his parental rights in C.B., and he has not appealed the trial court's acceptance of his relinquishment.

Is the State required to file verified briefs in cases involving parental rights?
As a preliminary matter, it is necessary to address the issue of whether the State is required to file verified briefs in a case involving parental rights. Initially, the brief that was filed by the State in this case lacked verification. This court issued an order directing the State to show cause why its brief should be accepted and why the appeal should not be heard on C.M.'s brief alone. The order stated that "K.S.A. 38-1591(e) requires that every brief in cases involving parental rights shall be verified by the interested party. *322 K.S.A. 2004 Supp. 38-1502(e) includes the State as an interested party." The State responded to the show cause order and argued that verification of its brief was not required under K.S.A. 38-1591(e). In a written order, this court determined that the panel hearing the instant case should decide whether the State, as the appellee, is required to file a verification of its brief in parental rights cases. This court ordered the State to file a verification of its brief but stated that such verification would not constitute a waiver of the issue. The State submitted a verification.
The issue of whether the State is required to submit a verification of its brief in a termination of parental rights case requires interpretation of K.S.A. 38-1591(e). Interpretation of a statute is a question of law, and an appellate court's review is unlimited. In re M.E.B., 29 Kan. App. 2d 687, 688, 29 P.3d 471 (2001).
Moreover, in interpreting K.S.A. 38-1591(e), we bear in mind the following principles:
"The fundamental rule of statutory construction to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. [Citation omitted.]" Williamson v. City of Hays, 275 Kan. 300, 305, 64 P.3d 364 (2003).
When a statute is plain and unambiguous, appellate courts will not speculate as to the legislative intent. State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas, 275 Kan. 763, 769, 69 P.3d 1087 (2003).
K.S.A. 38-1591 relates to appeals that are taken from proceedings under the Kansas Code for the Care of Children. K.S.A. 38-1591(e) requires the following: "Every notice of appeal, docketing statement and brief shall be verified by the interested party if the party has been personally served at any time during the proceedings. Failure to have the required verification shall result in the dismissal of the appeal." As this court pointed out in the show cause order, K.S.A. 2004 Supp. 38-1502(e) includes the State as an "interested party."
*323 Citing legislative history and In re J.A., 30 Kan. App. 2d 416, 42 P.3d 215, rev. denied 274 Kan. 1112 (2002), the State implicitly argues that K.S.A. 38-1591(e) is solely directed toward a parent whose rights have been terminated. This court, in In re J.A. stated:
"The minutes of the March 22, 2000, Senate Judiciary Committee meeting on Sub. S.B. 633 indicate that K.S.A. 38-1591(e) was designed to alleviate the problem of attorneys who were bound to proceed with appeals in termination cases even if the parent was disinterested or could not be located. It required the parent(s) to `acknowledge their wish to continue appeal at every level of appeal or the appeal shall be dismissed.'" 30 Kan. App. 2d at 422-23.
Nevertheless, when a statute is unambiguous, appellate courts have no authority to turn to legislative history. Brown v. U.S.D. No. 333, 261 Kan. 134, 142, 928 P.2d 57 (1996). Instead, the statute must be applied as written.
The State argues that K.S.A. 38-1591(e) only applies to appellants. Pointing to the language "[e]very notice of appeal, docketing statement and brief shall be verified" under K.S.A. 38-1591(e), the State maintains that had the legislature intended this provision to apply to appellees, it would have used the term "or" instead of "and" in this phrase. The State points out that an appellant is the party required to file a notice of appeal, docketing statement, and brief and that an appellee cannot file a docketing statement without filing a cross-appeal. Moreover, the State argues that the phrase under K.S.A. 38-1591(e) "if the party has been personally served at any time during the proceedings" provides further indication that the appellee, which is usually the State, does not need to file a verified brief. The State asserts that it usually initiates the child in need of care actions and cannot be personally served. Finally, the State argues that the remedy under K.S.A. 38-1591(e) that the "[f]ailure to have the required verification shall result in the dismissal of the appeal," proves that this statute only applies to appellants. The State contends that if the legislature had intended 38-1591(e) to apply to appellees, it would have included the remedy that was suggested in the show cause order in this case: that the brief would not be considered.
K.S.A. 38-1591(e) states that "[e]very notice of appeal, docketing statement and brief shall be verified by the interested party if the *324 party has been personally served at any time during the proceedings." (Emphasis added.) Under K.S.A. 38-1591(a), only an interested party can appeal "from any adjudication, disposition, termination of parental rights or order of temporary custody." We must determine from K.S.A. 38-1591(e) whether the legislature's use of the word and was intended to identify several different interested parties or to identify the traits of a single interested party.
In K.S.A. 38-1591(e), the legislature refers to the interested party in the singular. K.S.A. 38-1591(e) identifies a single entity possessing multiple traits: "Every notice of appeal, docketing statement and brief [traits] shall be verified by the interested party [entity] if the party has been personally served at any time during the proceedings [trait]." K.S.A. 38-1591(e) enumerates the traits of a single interested party.
Under Supreme Court Rule 2.04, an appellant is the party required to file a notice of appeal, a docketing statement, and a brief. (2004 Kan. Ct. R. Annot. 10). In addition, the appellant, as an interested party, would normally be personally served with a copy of the petition and summons. See K.S.A. 38-1532; K.S.A. 38-1533(a); K.S.A. 38-1582. It is apparent that the legislature used the word and in K.S.A. 38-1591(e) to enumerate the traits of a single interested party: an appellant. The word and is used to enumerate the traits of a single entity. See American English Usage 24 (1958).
Because the State was not an appellant in this appeal, the State was not required to file a verification of its brief under K.S.A. 38-1591(e). In addition, there is nothing in the record indicating that the State has been personally served at any time during the proceedings in this case. Under K.S.A. 38-1591(e), the requirement that "[e]very notice of appeal, docketing statement and brief shall be verified by the interested party" is conditioned upon an external event: the party being personally served during the proceedings. Because there is no indication that this condition has been met in the instant case, this also excuses the State from having to file a verification of its brief under K.S.A. 38-1591(e). See In re J.A., 30 Kan. App. 2d at 423 ("K.S.A. 38-1591[e] does not require verification of the notice of appeal when a party is not personally served with process.").

*325 Was there substantial competent evidence to support the trial court's decision?

We turn now to C.M.'s arguments regarding the trial court's ruling in this case. C.M. argues that the trial court's finding of unfitness, as well as the finding that her purported unfitness was unlikely to change in the foreseeable future, was not supported by substantial competent evidence.
Our standard of review in a termination of parental rights case is whether there is substantial competent evidence to support the trial court's findings. As an appellate court, we do not reweigh the evidence or determine the credibility of witnesses. We review the evidence in the light most favorable to the prevailing party. Although the State has the burden to prove parental unfitness by clear and convincing evidence at the trial court level, that standard does not affect the scope of review of an appellate court. In re J.J.G., 32 Kan. App. 2d 448, 454, 83 P.3d 1264 (2004).
The Kansas Code for the Care of Children provides that the court may terminate parental rights when the court finds by clear and convincing evidence that a parent is unfit by reason of conduct or condition which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2004 Supp. 38-1583(a). The statute lists nonexclusive factors the court shall consider in determining if severing parental rights is in the best interest of the child. K.S.A. 2004 Supp. 38-1583(b); In re S.M.Q., 247 Kan. 231, 236, 796 P.2d 543 (1990).
The court shall also consider a separate list of nonexclusive factors when a child is not in the physical custody of the parent. K.S.A. 2004 Supp. 38-1583(c); In re M.M., 19 Kan. App. 2d 600, 604, 873 P.2d 1371 (1994). Any one of the factors in K.S.A. 2004 Supp. 38-1583(b) or (c) may be, but is not necessarily, sufficient to establish grounds for terminating parental rights, and the court shall consider all applicable factors, giving primary consideration to the needs of the child. K.S.A. 2004 Supp. 38-1583(e); In re C.C., 29 Kan. App. 2d 950, 953, 34 P.3d 462 (2001).
In terminating C.M.'s parental rights in C.B., the trial court found that C.M. was unfit on the following grounds under K.S.A. *326 2004 Supp. 38-1583(b) and (c): excessive use of dangerous drugs, 38-1583(b)(3); physical, mental, and emotional neglect of C.B., 38-1583(b)(4); reasonable efforts by the appropriate agencies have been unable to rehabilitate the family, 38-1583(b)(7); lack of effort on C.M.'s part to adjust her circumstances, conduct, or conditions to meet C.B.'s needs, 38-1583(b)(8); failing to maintain regular visits, contact, or communication with C.B. or C.B.'s custodian, 38-1583(c)(2); failing to carry out a reasonable plan approved by the court directed toward the integration of C.B. into C.M.'s home, 38-1583(c)(3); and C.M.'s failure to pay a reasonable portion of the costs to substitute physical care and maintenance based upon ability to pay, 38-1583(c)(4).
C.M. argues that in each of the individual findings of unfitness, the trial court relied upon her drug problem which was insufficient, in and of itself, to support a finding of unfitness. C.M. contends that the trial court must find corresponding and objective symptoms of unfitness which are attributable to the drug problem.
C.M. fails to provide any support for her argument that a parent's drug addiction alone cannot support a finding of unfitness. K.S.A. 2004 Supp. 38-1583(e) indicates that any one of the factors under that statute may, but does not necessarily, establish grounds for termination. "[E]xcessive use of intoxicating liquors or narcotic or dangerous drugs" is one of the factors that the trial court is required to consider when determining whether parental rights should be terminated. K.S.A. 2004 Supp. 38-1583(b)(3).
Nevertheless, it is unnecessary to address C.M.'s argument any further because the trial court did not rely solely on her drug addiction in terminating parental rights. In making the findings under K.S.A. 2004 Supp. 38-1583(b) and (c), the trial court stated that there had been an overall lack of performance by C.M. in this case. The trial court found that C.M. had continued to use drugs while agreeing to a reintegration plan, that C.M. was addicted to methamphetamine, that C.M. had failed to meet C.B.'s needs, that there had been a continuing desire on the part of the social workers to work with C.M. and encourage her to continue with her reintegration tasks, that C.M.'s move to Mississippi did not appear to have been the best thing for C.B. and also made it more difficult for *327 anyone to work with C.M., that C.M. had a history of running from problems, that C.M. had missed a holiday visit with C.B. due to her drug use, that C.M. had failed to carry out the reintegration plan, that C.M. had not paid ordered child support, and that C.M. did not have a permanent residence which prohibited an Interstate Compact Placement for Children from being started. The trial court noted that C.M. had spent 4 of the 6 months prior to trial in structured settings with required performance and that she had made very little achievement on her own. The trial court further noted that C.B. had been in C.M.'s care for 3½ months but had spent about 17 months with her grandparents.
In determining that C.M. was unfit and that her unfitness was unlikely to change in the foreseeable future, the trial court stated:
"This whole case is about [C.B.] It's not about Mom and not about Mom's time frame. She has had an opportunity to show her ability to change. The Court does find it's unlikely that Mom's unfitness will change in the foreseeable future. Foreseeable future is a legal term that's used that's based upon the child's frame of reference. Based upon Mom's substantial history and unfitness and lack of performance, running from problems, poor decision making and lack of a reliable track record on her own, and based upon [C.B.'s] tender age and the amount of time that she's already spent out of parental custody with a reliable caregiver, the Court does find it's in [C.B.]'s best interest to terminate Mom's parental rights."
We find substantial competent evidence in the record to support the trial court's finding of unfitness.
C.M. argues, however, that her history in the 6 months before trial demonstrated that there was not substantial competent evidence to support the trial court's finding that her unfitness was unlikely to change in the foreseeable future. In addressing C.M.'s argument, we must remember that in applying K.S.A. 2004 Supp. 38-1583(a), the trial court should look at "foreseeable future" from the child's perspective which differs from that of an adult. See In re C.C., 29 Kan. App. 2d 950, Syl. ¶ 2.
The evidence established that C.M. had been given ample opportunity to comply with the requirements of the reintegration plan but still had not done so by the time of trial, which was approximately 8 months after the date set for her to accomplish the tasks. Although the evidence did show that C.M. had completed some *328 tasks outlined in her reintegration plan in the 6 months prior to trial, she performed many of these tasks while she was in a structured, supervised setting where these things were required. By the time of the trial, C.M. still had not complied with several key aspects of the reintegration plan such as providing UA's and establishing a permanent residence. C.M. had used methamphetamine as late as March 2004, after she agreed in the achievement plan, the reintegration plan, and the permanency plan to abstain from using drugs. Although C.M. claimed that she was no longer using drugs, she failed to submit UA's to her caseworker which would provide tangible proof that she was complying with the case tasks. In addition, C.M. had not obtained individual counseling, provided monthly budgets to her caseworker, or kept current in her child support. C.M. had secured full-time employment by the time of trial but had only been working at the job for approximately 1½ weeks and had not demonstrated that she could provide stable income for her household. Furthermore, C.M. failed to set forth a firm plan to establish a permanent residence so that an ICPC could be started in the case.
By the time of trial, C.B. had been out of C.M.'s custody for approximately 17 months of her 23½-month life. C.M. had failed to comply with the tasks outlined in the reintegration plan. C.M. had not even gotten to the point where an ICPC, which takes about 6 months to complete, could be performed so that C.B. could be returned to her care. After reviewing the record on appeal, we determine that substantial competent evidence exists to support the trial court's finding that C.M. was unfit and that her unfitness was unlikely to change in the foreseeable future. We conclude that the trial court did not err in its decision to terminate C.M.'s parental rights.
Affirmed.